IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARLOS D. NELSON, | ) | CASE NO. 1:21-CV-01784-JG |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    INTRODUCTION

Plaintiff Carlos Nelson ("Mr. Nelson") seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits ("DIB") and Period of Disability ("POD"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated 09/02/2022). For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.    PROCEDURAL HISTORY

On June 14, 2019, Mr. Nelson filed applications for DIB and POD, alleging a disability onset date of December 10, 2018. (Transcript ("Tr.") 188-94). Mr. Nelson's applications related to his conditions of back pain, carpal tunnel syndrome, IBS, "swelling in the back of [his] head and right side," and permanent nerve damage. (Tr. 125, 130). The Social Security Administration ("SSA") denied Mr. Nelson's applications initially and upon reconsideration, and Mr. Nelson requested a hearing before an administrative law judge ("ALJ"). (Tr. 124-32, 133, 134-40, 141-42). On October 9, 2020, an ALJ held a hearing via telephone during which Mr. Nelson,

represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 40-84). On November 17, 2020, the ALJ issued a written decision finding that Mr. Nelson is not disabled. (Tr. 15-34). The ALJ's decision became final on August 9, 2021, when the Appeals Council declined further review. (Tr. 1-7).

On September 17, 2021, Mr. Nelson filed his Complaint to challenge the Commissioner's final decision. (ECF Doc. No. 1). The parties have completed briefing in this case. (ECF Doc. Nos. 8, 9, and 10). Mr. Nelson asserts the following three assignments of error:

(1) The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.

(2) The ALJ's RFC was not supported by substantial evidence as he failed to properly evaluate the evidence documenting the combination of Nelson's severe impairments and make a proper determination regarding the effect of Nelson's pain and other symptoms on his ability to engage in substantial gainful activity on a full time and sustained basis.

(3) At Step Four of the Sequential Evaluation, the ALJ'S RFC was not supported by substantial evidence when he erroneously found that Nelson could still perform his past work.

(ECF Doc. No. 8, PageID # 840).

## III.    BACKGROUND

### A.    <u>Personal, Educational, and Vocational Experience</u>

Mr. Nelson was born in September 1972 (Tr. 48), and he was 46 years old on the alleged onset date (Tr. 188). Mr. Nelson has a high school education and some college, is married, and lives in an apartment with his wife. (Tr. 49). Mr. Nelson's past relevant work includes work as a shipping and receiving clerk, quality control inspector, food sales clerk, and telephone solicitor. (Tr. 77-79).

### B.    Relevant Hearing Testimony

#### 1.    *Mr. Nelson's Testimony*

Mr. Nelson testified that he stopped working in December 2018. (Tr. 49). At that time, Mr. Nelson was working as a shipping and receiving clerk at Amazon. (*Id.*). When the ALJ asked Mr. Nelson what prompted him to apply for disability, Mr. Nelson responded: "Because I'm unable to work. I can't drive. I can't do a full shift of work. I can't go and physically earn a paycheck." (Tr. 66-67). Mr. Nelson then explained that he experiences back pain, cannot lift heavy objects, has chronic diarrhea that occurs at random three to four times per day (and up to five to six times on a "bad" day), experiences frequent gas pains, has occasional numbness in his hands related to his carpal tunnel syndrome, and has chronic headaches a few times per week that last between thirty and forty-five minutes. (Tr. 67-69, 73, and 75).

Regarding his daily activities, Mr. Nelson testified that he wakes up, sees his wife off to work, eats, prays, and draws (sometimes up to four hours per day). (Tr. 63-64). Mr. Nelson testified that his wife cooks, cleans, does the laundry, and goes grocery shopping. (Tr. 63, 66). Mr. Nelson testified that he drives and goes to the grocery store for basic items, but not with a full grocery list. (Tr. 49, 66).

#### 2.    *Vocational Expert's Testimony*

The ALJ asked the VE to consider a person with Mr. Nelson's age, education, and vocational background who was physically limited in the way in which the ALJ determined Mr. Nelson to be limited. (Tr. 22, 79-80). The VE opined that such an individual could perform Mr. Nelson's past work as a food sales clerk and a telephone solicitor as normally performed, as well as other jobs in the national economy, such as a cashier, housekeeper, and production assembler. (Tr. 79-81). The ALJ then asked the VE whether a hypothetical individual could perform any of Mr. Nelson's past work if that person was limited to occasional handling and fingering bilaterally.

(Tr. 81). The VE responded that the person could not, but that other jobs exist that the hypothetical person could perform, such as a rental clerk or surveillance system monitor. (*Id.*). Mr. Nelson's counsel then asked the VE whether the hypothetical person's need for ready access to the bathroom would preclude that person from performing work as a rental clerk or surveillance system monitor. (Tr. 82). The VE responded that "it depends on how urgently and how often the individual needs to use [the bathroom]. You can certainly need the use of the bathroom so frequently over a restricted prolonged period that it interferes with your ability to be . . . productive at work." (Tr. 82-83).

### C.    <u>Relevant Medical Evidence</u>

In this proceeding, Mr. Nelson primarily challenges the ALJ's findings with respect to his chronic diarrhea, diverticulitis, spine disorders, carpal tunnel syndrome, and headaches. The ALJ summarized Mr. Nelson's health records and symptoms related to these issues as follows:

> The claimant testified that he experienced chronic diarrhea with frequent bathroom trips about three to four times per day that last for 15 minutes each. He explained that prior to treating with medication he used to have five to six bathroom trips per day, but the medication had helped. Prior to the alleged onset date, a colonoscopy from April 25, 2018 showed diverticulosis in the sigmoid colon, in the descending colon, and in the transverse colon, as well as non-bleeding hemorrhoids and polyps that were removed. (1F, 7-9). On May 7, 2019, the claimant attended a gastroenterology appointment with Sara Kravochuck, APRN CNP for complaints of having two to four bowel movements daily. He reported stopping fiber and eating lactose again. Records note that prior to the May 2019 appointment the claimant was last seen on May 1, 2018 for diarrhea. Upon examination, the claimant's abdomen was soft and nontender. He exhibited normal bowel sounds. Ms. Kravochuck diagnosed the claimant with adenomatous colon poly and chronic diarrhea. She renewed his prescription for psyllium hush oral powder. She recommended restarting psyllium husk and avoid lactose. (6F, 14-17). A review of systems from March 2019, April 2019, and January 2020 was negative for diarrhea or the claimant denied diarrhea. (3F, 4-9; 12F). Further, in September 2020, records with Sara Pepple, APRN CNP reflect continued conservative treatment for his adenomatous colon polyps and chronic diarrhea with the continuation of fiber and dicyclomine. (20F). . . .
>
> The claimant has a history of spine disorders (lumbar, cervical, and thoracic), carpal tunnel syndrome (bilateral), and obesity.

4

With respect to the claimant's spine disorders (lumbar, cervical, and thoracic), the claimant received treatment and imaging during the relevant period. An x-ray of the lumbar spine from May 25, 2018 showed degenerative changes mainly at L4-5 and L5-S1. (6F, 35-36). On December 29, 2018, the claimant presented to the emergency department for complaints of upper back pain that began that day. Upon examination by David Branch, D.O., the claimant exhibited painful back range of motion, but no localized spinal tenderness, painful spinal percussion, or motor or sensory deficits. The claimant was not in apparent distress. Dr. Branch felt that the claimant had acute thoracic back pain and he instructed the claimant to follow up for his pain. (11F, 80-93).

The claimant attended an orthopedic appointment with Harkeet Sandhu, M.D. on January 21, 2019. He complained of increased low back pain and feeling a pop while shoveling. An x-ray of the lumbar spine referenced in treatment records showed satisfactory alignment of the lumbar spine with some lordosis with some degenerative change more pronounced at L4-5 and L5-S1. There was no facture or subluxation noted. (8F, 4). Upon examination, the claimant could forward flex and reverse extend with limited lumbar range of motion and guarding. There was pain with left and right lateral rotation and some mild pain over the paraspinal muscles. However, the claimant did not have midline lumbar tenderness. His bilateral quadriceps strength was 5/5. He had negative straight leg left testing bilaterally. The claimant was neurovascularly intact. Dr. Shandhu diagnosed the claimant with lumbar degenerative disc disease. He placed the claimant on a short course of prednisone and a muscle relaxant. He recommended physical therapy. (8F, 3-4). Records reflect that the claimant attended physical therapy between January 2019 and February 2019. It was noted on February 15, 2019 that the claimant completed all exercises with no signs of distress, but with continued complaints of high pain levels and no relief from therapy. He was discharged from physical therapy on March 4, 2019 because he demonstrated worsening of condition leading to a physical recommendation to stop physical therapy. (2F).

An electromyogram report from February 27, 2019 showed electrodiagnostic evidence of bilateral median mononeuropathies at the wrist (carpal tunnel syndrome) with evidence of sensory of fiber axonal loss, but there was no evidence of a left or right cervical radiculopathy. (11F, 63). The claimant underwent a right carpal tunnel release on April 17, 2019 and a left carpal tunnel release on May 1, 2019 with Scott Ciaccia, D.O. (5F, 6-16). On May 23, 2019, the claimant attended a post-operative appointment with Amanda Homady, PA-C. The appointment was approximately six week status post right carpal tunnel release and two weeks status post left carpal tunnel release. He complained of minimal aching pain and discomfort that was relieved by rest and aggravated by use. He reported a complete resolution of his numbness and tingling bilaterally and that he took his sutures out on his own. The claimant stated that the past couple of weeks he had been working on range of motion and some early weightbearing. Upon examination, the claimant's range of motion was within normal limits for the first postoperative visit. He could move the extremity on the operative limb in a normal fashion without significant change. His neurovascular status was unchanged. The claimant exhibited functional arc of motion with flexion, extension, pronation, and supination. He had

a full composite fist on examination. His incision was well healing. Ms. Homady stated that the claimant had bilateral carpal tunnel syndrome status post release. She wanted the claimant to continue to work on range of motion exercises of the bilateral hands, scar massage, and desensitization. She explained that the claimant could follow up with her office as needed. (8F, 13-14). Records do not reflect additional follow up for his carpal tunnel syndrome.

On March 9, 2019, the claimant presented to the emergency room for headache beginning that morning with swelling on the back of the head. He reported one to four headaches per month on the right posterior part of his head. He denied associated headaches symptoms. He explains that they usually lasted 24 hours and improved with medication. Upon examination by Singh Deeppreet, M.D., the claimant cranial nerves were intact. His motor function was normal and symmetrical. He had a normal sensory examination, normal gait and station, normal strength and muscle tone, normal digits, and non-tender extremities. He was in no apparent distress. A CT scan of the brain on March 9, 2019 showed no acute intracranial process. (6F, 22). Dr. Deeppreet diagnosed the claimant with recurrent occipital headaches. He was instructed to follow up with another provider. (6F, 39-46). Records note that he was examined in a neurology clinic for his headaches on May 6, 2019 by Darshan Mahajan, M.D. where he reported taking Tylenol or aspirin with a good response. Dr. Mahajan diagnosed the claimant with muscle contraction headaches. He instructed the claimant to take Tylenol at the very onset of the headaches, which did seem to work for the claimant. He also showed the claimant how to relax his orbital, forehead, and back muscles. (4F, 3-7). Additional records reflect a follow up appointment with Dr. Mahajan on July 23, 2020. He stated that he had not really been having any headaches lately. Examination findings included no facial weakness, moving all extremities, and good balance when ambulating. Dr. Mahajan felt that the claimant's muscle contraction-type headaches were stable. (17F, 8-10).

The claimant attended pain management appointments on March 11, 2019 with Osama Malak, M.D as referred by Dr. Shandhu. Upon examination, the claimant had mild tenderness in the midline and moderate tenderness over the left paravertebrally region of the lumbar spine. There was positive facet loading on the right and negative facet loading on the left. He did not have tenderness over the sacroiliac joint area bilaterally. Straight leg raise testing as normal. The claimant's strength, sensation, and reflexes of the lower extremities were within normal limits bilaterally. Dr. Malak diagnosed the claimant with low back pain, other intervertebral disc degeneration, lumbar region, and spondylosis with myelopathy or radiculopathy, lumbar region. He continued the claimant on meloxicam and cyclobenzaprine. He wanted the claimant to have a[n] MRI. (3F, 4-6). An electromyogram from March 20, 2019 showed evidence of subacute to chronic, mild-to-moderate, right L5-S1 polyradiculopathy with evidence of active denervation in the medial gastrocnemius muscle. There was no evidence of a large-fiber peripheral neuropathy. (11F, 33). An MRI of the lumbar spine from March 28, 2019 showed diffuse disc bulges as well as focal disc herniation at the L3-4 and L2-3 levels and multi-focal degenerative changes. (3F, 10-11).

On April 8, 2019, the claimant returned to see Dr. Malak. He stated that his low back pain showed a definite reduction in severity, but he rated his low back pain as eight on the pain scale. Examination findings remained similar to those from March 11, 2019. Dr. Malak explained that the claimant was still complaining of lower back pain and an MRI showed multiple levels of lumbar disc bulging worse at L3-4. He stated that the claimant would be scheduled for an injection and continued on Flexeril and meloxicam. He gave the claimant work restrictions discussed below. (3F, 7-9). Records do not seem to reflect that the claimant had an injection or continued treatment with Dr. Malak after April 2019.

The claimant attended a neurosurgery appointment on May 8, 2019 with Bo H. Yoo, M.D. He stated that he had intermittent low back pain with exacerbation in October 2018 after a motor vehicle accident where he was rear-ended. He stated that he failed physical therapy two times. Upon examination, the claimant exhibited decreased lumbar back decreased range of motion and tenderness. His patellar reflexes were zero on the right and left side. However, his gait was normal. He exhibited normal strength and no sensory deficit as he was intact to light touch and pinprick. There was no Babinkski's signs. The claimant exhibited 2+ Achilles reflexes. There was negative bilateral straight leg-raise testing and no ankle clonus bilaterally. Dr. Yoo diagnosed the claimant with lumbar degenerative disc disease, spinal stenosis of lumbar region without neurogenic claudication, and lumbar spondylosis. He stated that clinically the claimant showed some decreased range of motion, but he was otherwise stable motor, sensory, and reflex findings. Dr. Yoo stated that with failed therapy, the claimant was recommended to undergo injections, and then surgery/decompression, as a last resort to less some of his pain. (5F, 2-6). Treatment records reflect that the claimant went for another nine sessions of physical therapy at the request of Dr. Mahajan between October 2019 to November 2019. (11F, 3-23).

On November 29, 2019, the claimant attended an appointment with Kala Ravichandran, M.D. He continued to complain of back pain. He stated he was on physical therapy and he wanted some medication for physical therapy. He denied radiation to the legs, tingling, or numbness on the legs. Upon examination, the claimant was in no apparent distress. His motor strength was 5/5 in the upper and lower extremities. His sensation was grossly intact to light touch and pain sensation. The claimant's deep tendon reflexes were normal. Dr. Ravichandran prescribed cyclobenzaprine and he renewed the claimant's prescription of meloxicam. (24F, 17-20).

The claimant attended a consultative physical examination with Paul Schefft, M.D. on January 30, 2020. The claimant reported constant lower back pain that was aggravated by bending, sitting, standing, lifting, and walk, but the pain did not radiate[] down either leg. He stated that he had neck pain for one year and numbness and tingling of the right hand. Upon examination, the claimant exhibited dorsolumbar spine paravertebral muscle spasm and tenderness to percussion of the dorsolumbar spinous processes. There was decreased range of motion with pain on movement of the neck and spine. However, the claimant had normal straight leg raise testing in the seated and supine position. He was able to stand on one leg at a

time, tandem gait, and squat without difficulty. He could walk on heels and toes. He ambulated with a normal gait that was not unsteady, lurching, or unpredictable. He appeared stable at station and comfortable in the supine and sitting positions. There was no cervical spine tenderness over the spinous processes and no evidence of paravertebral cervical muscle spasm. The claimant exhibited no hand tenderness, redness, warmth, or swelling. There was no hand atrophy. He was able to make a fist bilaterally. His grip strength was considered normal and graded 5/5 bilaterally as confirmed by squeezing the examiner's fingers. He could write with the dominant hand and pick up coins with his hands without difficulty. The claimant's shoulders, elbows, and wrists were non-tender. His hand range of motion was normal. Dr. Schefft felt that the claimant had dorsolumbar sprain, cervical neck pain, and possibly carpal tunnel syndrome. (14F).

The claimant returned to see Dr. Ravichandran on January 20, 2020. He complained of neck pain with no radiation, tingling, or numbness in the arms. Dr. Ravichandran recommended the claimant having diagnostic imaging. (24F, 27-30). A cervical spine x-ray from January 10, 2020 showed significant uncinated hypertrophy at C6-7 with left foraminal encroachment. It also showed some minimal discogenic anterior spurring at several levels. However, vertebral alignment was normal, all cervical vertebra were normal in height, no prevertebral soft tissue thickening, and intact posterior elements without fracture or subluxation. (24F, 31). A thoracic spine x-ray form January 10, 2020 showed minimal degenerative change without acute findings. (24F, 32).

On January 21, 2020, the claimant returned to see Dr. Mahajan for his low back pain. He stated that he did physical therapy and the pain was still there, but physical therapy helped some. He explained that he could see the difference after physical therapy. Dr. Mahajan emphasized to the claimant that he needed to do his back exercises regularly and watch his posture. Upon examination, the claimant's strength was well-maintained. His balance was good. He was ambulating well. Dr. Mahajan felt that the claimant would do well with exercise for his neck and back pain. (13F, 5-7).

Treatment continued for his pain on March 3, 2020 when the claimant attended an orthopedics appointment with Robert Berkowitz, M.D. He stated that he had one year of back pain with no leg symptoms. He explained that his main goal was to feel better so that he could work. Upon examination, the claimant exhibited a little tenderness of the lumbar spine in the paraspinous musculature. He had decreased lumbar spine range of motion in all directions, especially with flexion and extension, which gave him pain at extremes. However, his neck revealed no swelling, step off, or point tenderness. His neck range of motion was well maintained without crepitus, instability, or exacerbation of pain. His neck strength was within normal limits. The claimant had a normal gait with the ability to walk on heel and toes. His thoracic spine was nontender. The claimant exhibited good lumbar spine strength with no instability. His lower extremities revealed no point tenderness, swelling, or deformity. The claimant's range of motion of the hips, knees, and ankles were full without crepitus, instability, or exacerbation of pain. His strength was 5/5 throughout. Dr. Berkowitz felt the claimant had low back pain. He wanted the

claimant to have a new MRI. (16F, 8-11). An MRI of the lumbar spine from June 26, 2020 showed right paracentral protrusion L2-3 disc with narrowing of the right lateral recess and effacement of the right L3 nerve root centrally, posterior central protrusion L3-4 and L4-5 disc levels causing anterior extradural defects, mild narrowing of the right L4-5 neural foramen, mild narrowing of the left L5-S1 neural foramen, narrowing of the lower three lumbar disc levels, and some hypertrophy of facet joints of the lower three lumbar disc levels. (15F, 2-3). The claimant returned for a follow up appointment on July 14, 2020 with Dr. Berkowitz. Dr. Berkowitz reviewed the MRI. He stated that the claimant was with back pain only and it was possible that the L2-3 right disc herniation was contributing to that, but the claimant did have some bulging discs and anular tears at L3-4, L4-5, and L5-S1. He explained that an operation on the claimant had a very low chance of success, but it was certainly an option if the claimant pain became severe and unrelenting and he had no other relief. However, he reiterated that at that point he did not think surgery was a good idea. He wanted the claimant to get into pain management and returned to see him as needed. (16F, 5-7).

On August 31, 2020, the claimant attended a pain management appointment with Charles Choi, M.D. Upon examination, the claimant had decreased lumbar spine range of motion and pain. He was negative for radiculopathy. Dr. Choi diagnosed the claimant with spondylosis of lumbar region without myelopathy or radiculopathy. He stopped the claimant's naproxen and placed the claimant on gabapentin. He wanted the claimant to have a lower lumbar facet joint injections at the L3-4, L4-5, and L5-S1. (18F, 1-6). A treatment record from September 20, 2020 note that the claimant could not obtain authorization for the facet joint injection as his insurance required four to six weeks of physical therapy. It further noted that the claimant would be advised to schedule and complete physical therapy and see the provider for follow up. (18F, 8). The claimant began attending physical therapy again in September 2020. (21F).

The claimant attended a functional capacity evaluation on October 6, 2020 with a physical therapist whose name was illegible. Upon screening by the physical therapist, the claimant's upper extremity range of motion, including his hands, was within normal limits and his upper extremity strength, including his hands, was 5/5. His lower extremity strength was 5/5. His truck flexion, exten[s]ion, rotation, and side bend were within functional limits. The claimant exhibited cervical flexion, extension, rotation, and side bend within normal limits. The therapist noted that the claimant's gave maximal effort with grip and pinch testing, but the values were very low. . . .

(Tr. 21, 23-28).

D.     **State Agency Medical Consultants**

   *1.*     ***Mila Bacalla, M.D.***

At the initial level, Dr. Bacalla reviewed Mr. Nelson's file on August 28, 2019. (Tr. 86-

102).  Dr. Bacalla indicated that Mr. Nelson's carpal tunnel syndrome and spine disorders are severe medically determinable impairments. (Tr. 95). In her residual functional capacity ("RFC") assessment, Dr. Bacalla indicted that Mr. Nelson could:

- occasionally lift and/or carry twenty pounds;
- frequently lift and/or carry ten pounds;
- stand and/or walk (with normal breaks) for six hours in an eight-hour workday;
- sit (with normal breaks) for about six hours in an eight-hour workday;
- frequently kneel, crawl, balance, and climb ramps and stairs; and
- occasionally stoop, crouch, and climb ladders, ropes, or scaffolds.

(Tr. 97-98). Dr. Bacalla also indicated that Mr. Nelson's handling and fingering is "[l]imited" due to his bilateral carpal tunnel syndrome, and that Mr. Nelson should avoid even moderate exposure to hazards (*i.e.*, machinery, heights, etc.). (Tr. 98-99).

> 2.      ***Maureen Gallagher, D.O., M.P.H.***

At the reconsideration level, Dr. Gallagher reviewed Mr. Nelson's file on January 27, 2020. (Tr. 104-120). Dr. Gallagher agreed with Dr. Bacalla's RFC assessment. (Tr. 115-117).

## IV.   THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2024.

2.  The claimant has not engaged in substantial gainful activity since November 10, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: spine disorders (lumbar, cervical, and thoracic), carpal tunnel syndrome (bilateral), and obesity (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can frequently handle and finger bilaterally, he can frequently climb ramps and stairs, he can occasionally climb ladders, ropes, and scaffolds, he can frequently balance, kneel, and crawl, he can occasionally stoop and crouch, he can only occasionally work at unprotected heights, and he cannot work near dangerous moving

machinery.

6.  The claimant is capable of performing past relevant work as a Sales Clerk, Food, and Telephone Solicitor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from November 10, 2018, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 20-34).

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations

is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original).

## B.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a). A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 404.1520. First, the claimant must first demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that

"significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Before considering Step Four, the ALJ must determine the claimant's RFC, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 416.930(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbot*, 905 F.2d at 923.

    C.   **Analysis**

Mr. Nelson raises three issues for judicial review. First, Mr. Nelson argues that the appointment of former Commissioner Andrew Saul as the Commissioner of the SSA violated the separation of powers and, as a result, the ALJ's decision in this case is constitutionally defective because the ALJ derived his authority from Commissioner Saul. (ECF Doc. No. 8, PageID # 848-851). Second, Mr. Nelson argues that the ALJ's RFC is not supported by substantial evidence because the ALJ failed to properly evaluate the combination of his severe impairments, as well as his pain and other symptoms, regarding his ability to engage in substantial gainful activity on a full-time and sustained basis. (*Id.* at PageID # 851-861). Third, Mr. Nelson argues that the ALJ erred at Step Four by determining that he could still perform his past work. (*Id.* at PageID # 861-

863).

### 1.  Mr. Nelson's First Assignment of Error

As noted, Mr. Nelson first argues that the ALJ's decision is constitutionally defective because the ALJ derived his authority from former Commissioner Andrew Saul, whose appointment as Commissioner of the SSA violated the separation of powers. (ECF Doc. No. 8, PageID # 848-851). Counsel for Mr. Nelson presented an almost identical argument in *Walker v. Comm'r of Soc. Sec.*, No. 1:21-CV-01474-JG (ECF Doc. No. 9, PageID # 656-695), which Judge Gwin rejected. *Walker*, 2022 WL 2612244, at *6-8 (N.D. Ohio May 17, 2022), *report and recommendation adopted*, No. 1:21-CV-01474, 2022 WL 4479922 (N.D. Ohio Sept. 27, 2022). Accordingly, I recommend that the Court reject Mr. Nelson's constitutional challenge for the same reasons set forth in the *Walker* Report and Recommendation previously adopted by the Court. *Id.*

### 2.  Mr. Nelson's Second Assignment of Error

Next, Mr. Nelson argues that the ALJ's RFC is not supported by substantial evidence because the ALJ failed to properly evaluate the combination of his impairments, as well as his pain and other symptoms, regarding his ability to engage in substantial gainful activity on a full-time and sustained basis. (ECF Doc. No. 8, PageID # 851-861). In addition to challenging the ALJ's RFC analysis, Mr. Nelson's second assignment of error also challenges the ALJ's Step Two and Step Three conclusions, as well as the ALJ's evaluation of his subjective complaints.[1] (*Id.*). For the following reasons, I conclude that Mr. Nelson's arguments lack merit.

---

[1] Courts in the Northern District of Ohio have previously cautioned Mr. Nelson's counsel to refrain from combining disparate challenges and arguments regarding the sequential disability evaluation together in a single assignment of error. *See, e.g.*, *Overstreet v. Comm'r of Soc. Sec.*, No. 1:21-CV-2062, 2022 WL 15524729, at *11 n.9 (N.D. Ohio Oct. 11, 2022) (citing Case No. 1:21-cv-00556, Doc. 19, at 34 n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. 19, at 34 n.5 (filed 2/2/2022); Case No. 5:20-cv-01340, Doc. 21, at 26 n.9 (filed 8/16/2021); Case No. 1:20-cv-01186, Doc. 21, at 25 n.8 (filed 8/16/2021)), *report and recommendation adopted*, No. 1:21CV2062, 2022 WL 15522981 (N.D. Ohio Oct. 27, 2022)).

### i. Step Two

At Step Two of the sequential evaluation process, an ALJ must determine whether a claimant's medically determinable impairment is a "severe" impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step two has been described as a '*de minimus* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988)). When an ALJ finds severe and non-severe impairments at Step Two and continues with the subsequent Steps in the sequential evaluation process, any error at Step Two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

### ii. Step Three

At Step Three of the sequential evaluation process, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of*

*Soc. Sec.*, 424 F. App. 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). "A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App. 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App. 639, 641-42 (6th Cir. 2013)). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

"It is well-established that a reviewing court conducts a holistic review of the ALJ's decision and may look to findings elsewhere in the opinion to support Step Three conclusions." *Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) (citing *Immke v. Saul*, 2020 WL 1940849, at *6 (N.D. Ohio April 22, 2020)). "Moreover, it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision." *Anderson* at *2 (citing *Ulman v. Commissioner of Social Security*, 693 F.3d 709, 713-14 (6th Cir. 2012)).

### a. Step Three: Listing 1.04

Mr. Nelson asserts that the ALJ erred by concluding that he did not satisfy the criteria of Listing 1.04A. (ECF Doc. No. 8, PageID # 853). Listing 1.04 establishes the criteria for disorders of the spine. 20 C.F.R. § 404, Subpart P, Appendix 1, §1.04. In order to meet the required level of severity under Listing 1.04(A), the claimant must show:

> [d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With . . . [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. § 404, Subpart P, Appendix 1, §1.04A.

### b.  Step Three: SSR 19-4p & Listing 11.02

Mr. Nelson asserts that the ALJ erred by failing to consider whether the medical evidence pertaining to his chronic tension-type and/or chronic cluster headaches satisfied the criteria of SSR 19-4p and, relatedly, Listing 11.02. (ECF Doc. No. 8, PageID # 857). SSR 19-4p provides guidance on how "primary headache disorders" such as chronic tension-type headaches and cluster headaches are established and evaluated. *See* SSR 19-4p, 84 Fed. Reg. 44667, 44667-71 (Aug. 26, 2019).

SSR 19-4p refers to the International Classification of Headache Disorders ("ICHD-3"), which "provides classification of headache disorders and diagnostic criteria for scientific, educational, and clinical use." *Id.* at *44668. The ICHD-3 diagnostic criteria for chronic tension-type headaches includes headaches "occurring on at least 15 days per month on average for more than 3 months, and satisfying the following criteria: [l]asting hours to days, or unremitting[,]" among other criteria. *Id.* at *44670.  The ICHD-3 diagnostic criteria for chronic cluster headaches includes "at least five headache attacks satisfying the following criteria: [s]evere or very severe unilateral orbital, supraorbital, or temporal pain lasting 15 to 180 minutes (when untreated)[,]" among other criteria. *Id.*

SSR 19-4p indicates that "[p]rimary headache disorder is not a listed impairment[,]" but Listing 11.02 (epilepsy) "is the most closely analogous listed impairment for a [medically determinable impairment] of a primary headache disorder." *Id.* at *44670-71. Regarding Listing 11.02, SSR 19-4p explains:

> While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her [medically determinable impairment](s) medically equals the listing.

Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [accepted medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

*Id.* at *44671.

### iii.    *Evaluation of a Claimant's Symptoms*

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed. Appx. 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).[2]

---

[2] The SSA previously characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination. *See* SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996). In March 2016, however, the SSA issued SSR 16-3p. Therein, the SSA explained that this characterization did not accurately reflect the language in the regulations and eliminated

In evaluating a claimant's symptoms at the second step of the analysis, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider. These factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7.

The ALJ is not required to discuss each of these factors or even all the evidence in the record, but need only acknowledge the factors and discuss the evidence that supports his decision. *See Bryson v. Comm'r of Soc. Sec.*, 2021 WL 2735993 at * 14 (N.D. Ohio June 10, 2021), *adopted by*, 2021 WL 2720071 (N.D. Ohio July 1, 2021). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029 at * 9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated

the term "credibility" from its sub-regulatory policy. *See* SSR 16-3p, 2016 WL 1119029 (Oct. 25, 2017). The SSA explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record. SSR 16-3p, 2016 WL 1119029. Despite these changes in terminology, courts have concluded that SSR 16-3p did not substantially change existing law on this issue. *See Banks v. Comm'r of Soc. Sec.*, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting language in SSR 16-3p that states intention to "clarify" and not to substantially "change" existing SSR 96-7p), adopted at 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

the individual's symptoms." *Id.*; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

An ALJ is not required to accept the claimant's complaints at face value but may discount them based on his consideration of the above factors. *See Dooley v. Comm'r of Soc. Sec.*, 656 Fed. Appx. 113, 119 (6th Cir. 2016); *Bryson*, 2021 WL 2735993 at * 15. In light of the ALJ's opportunity to observe the claimant's demeanor, the ALJ's evaluation of a claimant's subjective symptoms is entitled to considerable deference and should not be discarded lightly. *See Dooley*, 656 Fed. Appx. at 119 ("[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'") (quoting *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)); *see also Walters v. Comm'r. of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Jidas v. Comm'r of Soc. Sec.*, 2019 WL 2252289 at * 8-9 (E.D. Mich. Feb. 26, 2019), adopted by, 2019 WL 1306172 (E.D. Mich. March 22, 2019).

Indeed, a reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001); *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017) (noting that "while an ALJ's credibility determinations must be supported by substantial evidence, we accord them special deference"); *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. Appx 468, 476 (6th Cir. 2016) (noting that, "in practice ALJ credibility findings have become essentially 'unchallengeable.'"); *Riebe v. Comm'r of Soc. Sec.*, 2019 WL 4600628 at * 7-8 (N.D. Ohio Sept. 23, 2019) (same).

### iv.    RFC

Prior to determining whether a claimant can perform his past relevant work at Step Four, an ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual

functional capacity."); 20 C.F.R. § 404.1520(e) ("[W]e will assess and make a finding about your [RFC] based on all the relevant medical and other evidence in your case record[.]"). RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). Agency regulations direct the ALJ's assessment of a claimant's RFC is to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. SSR 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

### v.    *The ALJ's Analysis*

As noted, the ALJ determined at Step Two that Mr. Nelson's spine disorders (lumbar, cervical, and thoracic), bilateral carpal tunnel syndrome, and obesity are severe impairments, but then determined at Step Three that Mr. Nelson does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 20, 22). Relevant to Mr. Nelson's arguments in his second assignment or error, the ALJ explained that Mr. Nelson's spine disorders did not meet or medically equal Listing 1.04. (Tr. 22). Then, during the ALJ's discussion of Mr. Nelson's RFC, the ALJ summarized Mr. Nelson's medical records, including those set forth above. (Tr. 23-32). The ALJ did not address whether Mr. Nelson's headaches satisfied Listing 11.02 & SSR 19-4p, as Mr. Nelson urges this Court to find in this proceeding.

In his RFC assessment, the ALJ noted that he considered the "entire record" and "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." (Tr. 22). The ALJ then addressed the limiting signs and symptoms associated with Mr. Nelson's severe impairments of spine disorders (lumbar, cervical, and thoracic), bilateral carpal tunnel syndrome, and obesity. (Tr. 22-29). The ALJ also discussed Mr.

Nelson's history of headaches, including his use of Tylenol or aspirin to treat his headaches. (Tr. 24-25). The ALJ did not specifically refer to Mr. Nelson's non-severe medically determinable impairment of diverticulitis in the RFC assessment, nor did the ALJ reference Mr. Nelson's testimony regarding his chronic diarrhea. The ALJ did, however, address these issues in his Step Two analysis (finding them non-severe), and indicated that he "considered all of [Mr. Nelson's] medically determinable impairments, including those that are not severe, when assessing [Mr. Nelson's] residual functional capacity." (Tr. 21).

Regarding Mr. Nelson's subjective complaints, the ALJ explained the two-step process for evaluating a claimant's symptoms, and concluded that Mr. Nelson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Mr. Nelson's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 23). In support of his decision, the ALJ explained:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms from his severe impairments, they are inconsistent because the level of limitation alleged is not altogether consistent with objective findings. Significant treatment included a right carpal tunnel release in April 2019 and a left carpal tunnel release in May 2019. (5F, 6-16). An electromyogram from March 2019 showed evidence of subacute to chronic, mild-to-moderate, right L5-S1 polyradiculopathy with evidence of active denervation in the medial gastrocnemius muscle. There was no evidence of a large-fiber peripheral neuropathy. (11F, 33). A cervical spine x-ray from January 2020 showed significant uncinated hypertrophy at C6-7 with left foraminal encroachment. It also showed some minimal discogenic anterior spurring at several levels. However, vertebral alignment was normal, all cervical vertebra were normal in height, no prevertebral soft tissue thickening, and intact posterior elements without fracture or subluxation. (24F, 31). A thoracic spine x-ray form January 2020 showed minimal degenerative change without acute findings. (24F, 32). An MRI of the lumbar spine from June 2020 showed right paracentral protrusion L2-3 disc with narrowing of the right lateral recess and effacement of the right L3 nerve root centrally, posterior central protrusion L3-4 and L4-5 disc levels causing anterior extradural defects, mild narrowing of the right L4-5 neural foramen, mild narrowing of the left L5-S1 neural foramen, narrowing of the lower three lumbar disc levels, and some hypertrophy of facet joints of the lower three lumbar disc levels. (15F, 2-3). Significant clinical findings include mild tenderness in the midline and moderate tenderness over the left paravertebrally

region of the lumbar spine or a little tenderness of the lumbar spine in the paraspinous musculature, positive right facet loading, decreased lumbar back range of motion and tenderness or decreased lumbar spine range of motion in all directions, especially with flexion and extension, with pain at extremes, and a BMI score as high as 37.02. (3F, 4-6; 5F, 2- 6; 16F, 8-11; 18F, 1-6; 24F, 39). Significant clinical findings from the consultative physical examination include dorsolumbar spine paravertebral muscle spasm, tenderness to percussion of the dorsolumbar spinous processes, and decreased range of motion with pain on movement of the neck and spine. (14F). At a functional capacity evaluation in October 2020, the claimant was noted to demonstrate maximal effort with grip and pinch testing, but the values were very low. (22F).

However, other clinical findings include negative left facet loading, no tenderness over the sacroiliac joint area, normal straight leg raise testing, strength, sensation, and reflexes of the lower extremities within normal limits, a normal gait, normal strength, 5/5 strength throughout, or 5/5 strength in the upper and lower extremities, normal deep tendon reflexes, no sensory deficit, no ankle clonus bilaterally, no neck swelling, step off, or point tenderness, well maintained neck range of motion without crepitus, instability, or exacerbation of pain, neck strength within normal limits, the ability to walk on heel and toes, non-tenderness of the thoracic spine, good lumbar spine strength with no instability, lower extremities with no point tenderness, swelling, or deformity, full hip, knee, and ankle range of motion, no radiculopathy, functional arc of motion with flexion, extension, pronation, and supination, full composite fist on examination, and no apparent distress. (3F, 4-6; 5F, 2-6; 8F, 13-14; 16F, 8-11; 18F, 1-6; 24F, 17-20, 37-38). Other clinical findings from the consultative physical examination include normal straight leg raise testing, the ability to stand on one leg at a time, tandem gait, and squat without difficulty, ambulating with a normal gait, appearing stable at station and comfortable in the supine and sitting positions, no cervical spine tenderness over the spinous processes, no evidence of paravertebral cervical muscle spasm, no hand tenderness, redness, warmth, or swelling, no hand atrophy, the ability to make a fist bilaterally, grip strength that was considered normal and graded 5/5 bilaterally as confirmed by squeezing the examiner's fingers, the ability to write with the dominant hand and pick up coins with his hands without difficulty, non-tenderness of the shoulders, elbows, and wrists, and normal hand range of motion. (14F). After the claimant's carpal tunnel releases, he was instructed to follow up as needed. (8F, 13-14). Records do not reflect additional follow up for his carpal tunnel syndrome. The claimant testified that he spent time drawing with pencils and ink up to three to four hours per day depending on a picture level of detail when his hands were not numb. He explained at the hearing that he dropped dishes, but clarified that he last dropped dishes in October or November 2018, which was before his carpal tunnel release surgery in April and May 2019. In July 2020, the claimant reported having decompression of the median nerves and doing better with that issue and not having any headaches lately. (17F, 8-10). Dr. Mahajan felt that the claimant's muscle contraction-type headaches were stable in July 2020. (17F, 8-10).

(Tr. 28-29).

23

*vi.*     *Mr. Nelson's Arguments*

Mr. Nelson argues that the ALJ erred at Step Two by failing to find that his chronic diarrhea and diverticulitis are severe impairments, and by failing to include his need for bathroom access in the RFC. (ECF Doc. No. 8, PageID # 852-853). In support of his argument, Mr. Nelson points to: (1) the results of his 2018 colonoscopy (indicating hemorrhoids, benign neoplasm of transverse colon, noninfective gastroenteritis and colitis, and diverticulitis); (2) his complaints of chronic diarrhea; (3) his testimony that he uses the bathroom three to four times per day (and up to five or six times on a "bad" day) for fifteen minutes each time; (4) his gas pains; and (5) the VE's testimony that the impact of Mr. Nelson's need for ready access to a bathroom would depend on how urgently and how often Mr. Nelson needed to use the bathroom. (*Id.*). Mr. Nelson concludes that "[f]ailing to include the need for bathroom access in the RFC was harmful error necessitating a remand of this matter." (*Id.* at PageID # 853).

Next, Mr. Nelson argues that the ALJ erred at Step Three by not determining that his spine disorders meet Listing 1.04. (ECF Doc. No. 8, PageID # 853). In support of his argument, Mr. Nelson points to an MRI indicating that his L2/3 disc was effacing the right L3 nerve root, which – he argues – demonstrates that he has objective testing providing proof of effacement of the right L3 nerve root. (*Id.*). Mr. Nelson also points to medical records documenting his diagnoses related to his spine disorders, back pain, decreased range of motion, physical therapy, MRI results, and the function report he completed wherein he "noted that his back did not allow him to stay on his feet for a full day shift and when he sat for a long period of time his back pain became unmanageable and his right foot became numb." (ECF Doc. No. 8, PageID # 853-855). Mr. Nelson asserts that "[t]he combination of the objective physical evidence, medical examinations, and [his] written and oral reports support the fact that his back problems limited his ability to perform his past work or any substantial gainful activity on a full time and sustained basis." (*Id.* at PageID #

855). Mr. Nelson concludes that "[t]he ALJ's findings regarding his limitations to the light level of exertion was, therefore, incorrect and necessitates a remand of this matter." (*Id.*).

Mr. Nelson also argues that the ALJ erred by limiting him to frequent handling and fingering to account for his carpal tunnel syndrome because the evidence indicates that he should be limited to no more than occasional handling and fingering. (ECF Doc. No. 8, PageID # 856). In support his argument, Mr. Nelson cites medical records documenting his carpal tunnel syndrome, his two carpal tunnel release surgeries, a study his counsel submitted to the ALJ related to hand grip strength, and x-ray evidence of significant hypertrophy at C6/7 with left foraminal encroachment. (*Id.* at PageID # 855-856). Mr. Nelson asserts that this evidence supports his complaints regarding the use of his hands, and undermines the ALJ's conclusion that, since Mr. Nelson spent time drawing, he can use his hands on a frequent basis. (*Id.* at PageID # 856). Mr. Nelson concludes that, because he should be limited to no more than occasional use of his hands, he is precluded from performing his past relevant work or any other work on a full-time and sustained basis, which necessitates a remand of the matter. (*Id.*).

Mr. Nelson further argues that the ALJ failed to consider whether his headaches satisfied the criteria of SSR 19-4p and relatedly, Listing 11.02. (ECF Doc. No. 8, PageID # 857). In support of his argument, Mr. Nelson cites his hearing testimony wherein he testified that he has headaches two or three times per week that last forty-five minutes, the functional report wherein he noted that his frequent headaches make it difficult for him to focus and concentrate, and treatment notes from Dr. Mahajan. (*Id.* at PageID # 857-858). Mr. Nelson concludes that "[t]his matter should be remanded as the frequency of his headaches were equivalent to the number of seizures required by Listing 11.02 along with other criteria" set forth in case law. (*Id.* at PageID # 858).

Mr. Nelson also argues that the ALJ erred by determining that Mr. Nelson's pain and subjective complaints were not entirely consistent with the medical evidence. (ECF Doc. No. 8,

PageID # 858). In support of his argument, Mr. Nelson cites his hearing testimony, wherein he testified that he is unable to work, drive (despite testifying that he can drive (Tr. 49)), or do a full shift of work due to his back pain and chronic diarrhea, as well as medical records documenting his complaints. (*Id.*). Mr. Nelson concludes that the ALJ's failure to find that his subjective complaints were supported by objective medical findings "was harmful and necessitates that this matter be reversed or remanded." (*Id.* at PageID # 858-859).

Finally, Mr. Nelson argues that the ALJ erred at Step Three by providing a perfunctory analysis, and by failing to provide sufficient information to allow this Court to conduct a meaningful review. (ECF Doc. No. 8, PageID # 859). Mr. Nelson also argues that, even if he did not meet the criteria of the Listings, the ALJ was still required to consider the effect of the combination of his physical impairments on his ability to perform his past work, or any other work, on a full-time and sustained basis, which – he argues – the ALJ did not do. (*Id.* at PageID # 860). Mr. Nelson further argues that the ALJ focused on benign or mildly adverse findings in assessing his RFC, and disregarded evidence that did not comport with his desired finding that Mr. Nelson could perform his past relevant work, which – he argues – runs afoul of SSR 96-8p. (*Id.*). Mr. Nelson concludes that the matter should be remanded for the ALJ to "build an accurate and logical bridge between the documentation in the record and the ALJ's finding that [he] is not disabled." (*Id.* at PageID # 861).

### vii.    *Analysis*

Mr. Nelson's arguments lack merit. First, regarding Mr. Nelson's argument that the ALJ erred at Step Two because he did not determine that Mr. Nelson's chronic diarrhea and diverticulitis are severe impairments, any error in that regard was harmless because the ALJ considered these impairments at later Steps. *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) ("An erroneous finding of nonseverity at step two is . . . harmless where the ALJ

26

properly considers nonsevere impairments at later steps."). Additionally, any argument that the ALJ did not consider these impairments when assessing Mr. Nelson's RFC lacks merit. Courts have held that an ALJ need not specifically discuss all non-severe impairments in the RFC assessment when the ALJ makes clear that his decision is controlled by SSR 96-8p. *See, e.g.*, *Emard*, 953 F.3d at 851-52; *Turner v. Comm'r of Soc. Sec.*, 2021 WL 6275633 at * 4 (6th Cir. 2021); *Davis v. Comm'r of Soc. Sec.*, 2015 WL 5542986 at *4 (W.D. Mich. Sept. 18, 2015). Here, the ALJ expressly noted in his summary of the applicable law that he was required to comply with SSR 96-8p's mandate to "consider all of the claimant's impairments, including impairments that are not severe[.]" (Tr. 19-20).

At Step Two, the ALJ considered Mr. Nelson's non-severe impairments and determined that there "is no indication in the record that the symptoms experienced from [these] impairments caused more than a minimal limitation in [Mr. Nelson's] ability to engage in basic work-relates activities for more than a 12-month period." (Tr. 21). In addition, at Step Two, the ALJ again stated that he had "considered all of [Mr. Nelson's] medically determinable impairments, including those that are not severe, when assessing [Mr. Nelson's] residual functional capacity." (*Id.*). Under these facts, Mr. Nelson has not established that the ALJ committed reversible error by not specifically referencing his non-severe impairments of chronic diarrhea and diverticulitis in assessing Mr. Nelson's RFC. *See Emard*, 953 F.3d at 852 ("The ALJ's express reference to SSR 96-8p, along with her discussion of the functional limitations imposed by [the claimant's] nonsevere impairments at step two of her analysis, fully support our conclusion that the ALJ complied with 20 C.F.R. § 416.945(e) and SSR 96-8p."). Moreover, to the extent Mr. Nelson relies upon his subjective complaints to support his argument, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Yee v. Comm'r of Soc. Sec.*,  No. 1:21-CV-02067, 2023 WL

121417, at *8 (N.D. Ohio Jan. 6, 2023) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476

(6th Cir. 2003).

      Next, Mr. Nelson's argument that his spine disorders meet Listing 1.04, and that the ALJ

erred by failing to find that his back problems limit his ability to perform his past relevant work

lacks merit. While Mr. Nelson points to evidence in support of his position, he has not explained

how the ALJ's decision is not supported by substantial evidence. *Smith-Johnson v. Comm'r of*

*Soc. Sec.*, 579 F. App. 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec. Admin.*,

544 F. App. 639, 641-42 (6th Cir. 2013)) ("A claimant must do more than point to evidence on

which the ALJ could have based his finding to raise a 'substantial question' as to whether he

satisfied a listing."). Here, the ALJ summarized the relevant medical records, including the various

x-rays,  MRIs, and treatment notes, and cited the relevant portions of the record upon which he

relied. For example, the ALJ cited records indicating that Mr. Nelson had:

> [a]n MRI of the lumbar spine from June 2020 showed right paracentral protrusion
> L2-3 disc with narrowing of the right lateral recess and effacement of the right L3
> nerve root centrally, posterior central protrusion L3-4 and L4-5 disc levels causing
> anterior extradural defects, mild narrowing of the right L4-5 neural foramen, mild
> narrowing of the left L5-S1 neural foramen, narrowing of the lower three lumbar
> disc levels, and some hypertrophy of facet joints of the lower three lumbar disc
> levels. (15F, 2-3).

But the ALJ cited records that Mr. Nelson also had:

> negative left facet loading, no tenderness over the sacroiliac joint area, normal
> straight leg raise testing, strength, sensation, and reflexes of the lower extremities
> within normal limits, a normal gait, normal strength, 5/5 strength throughout, or 5/5
> strength in the upper and lower extremities, normal deep tendon reflexes, no sensory
> deficit, no ankle clonus bilaterally, no neck swelling, step off, or point tenderness,
> well maintained neck range of motion without crepitus, instability, or exacerbation
> of pain, neck strength within normal limits, the ability to walk on heel and toes, non-
> tenderness of the thoracic spine, good lumbar spine strength with no instability,
> lower extremities with no point tenderness, swelling, or deformity, full hip, knee,
> and ankle range of motion, no radiculopathy, functional arc of motion with flexion,
> extension, pronation, and supination, full composite fist on examination, and no
> apparent distress. (3F, 4-6; 5F, 2-6; 8F, 13-14; 16F, 8-11; 18F, 1-6; 24F, 17-20, 37-
> 38).

(Tr. 28-29). While the ALJ did not include his analysis of Mr. Nelson's medical records within his discussion of Step Three, the ALJ indicated his decision was "discussed in more detail below[.]" (Tr. 22). When viewed as a whole, substantial evidence supports the ALJ's Step Three conclusion that Mr. Nelson did not satisfy the requirements of Listing 1.04. *See Anderson*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("It's well-established that a reviewing court conducts a holistic review of the ALJ's decision and may look to findings elsewhere in the opinion to support Step Three conclusions.").

Additionally, Mr. Nelson's argument that the ALJ erred by limiting him to frequent, as opposed to occasional, handling and fingering lacks merit. The ALJ addressed the medical records documenting Mr. Nelson's carpal tunnel syndrome, his two carpal tunnel release surgeries, and the study Mr. Nelson's counsel submitted to the ALJ related to hand grip strength. (Tr. 24, 28-29). The ALJ cited a consultative physical examination wherein Mr. Nelson was found to have "no hand atrophy, the ability to make a fist bilaterally, grip strength that was considered normal and graded 5/5 bilaterally as confirmed by squeezing the examiner's fingers, the ability to write with the dominant hand and pick up coins with his hands without difficulty, non-tenderness of the shoulders, elbows, and wrists, and normal hand range of motion. (14F)." (Tr. 29). The ALJ also indicated that Mr. Nelson did not pursue additional follow-up care after his carpal tunnel releases. (Tr. 29). Regarding the study Mr. Nelson's counsel submitted to the ALJ, the ALJ explained:

> The claimant's representative, Mr. November, submitted a study on hand grip strength, which explored the relationship of grip strength with elevated BMI and found no significant relationships. The aim of the study was noted to described normative data for hand grip strength in a community-based Australian population. Further, the study compared the Australian sample with international grip strength norms, finding these population-based norms to be lower than international convenience samples. (16E). He argued that it was submitted to impeach the Consultative Physical Examiner Dr. Schefft who concluded the claimant's hand strength was within normal limits. The argument is not supported by examination findings from February 2020 where the claimant was found to have 5/5 strength in the upper extremities or with the reports of the claimant after surgery in May 2019 that he had a complete resolution of his numbness and tingling bilaterally or in July

2020 when he reported that he was doing better after his median nerve decompression. (8F, 13-14; 17F, 8-10; 24F, 37-38). At the hearing, he testified that when his hands were not numb, he sometimes spent up to three to four hours drawing with pencil and ink. Further, there were no medical doctors who examined the claimant or submitted an opinion disputing the strength in the claimant's hands since his carpal tunnel release surgery. (11F-13F; 15F-18F; 21F-24F). Overall, I find the study to be unpersuasive as there is no testimony from a medical provider that specifically explains how it relates to the claimant's case. However, I find that the claimant required a limitation of frequent handling and fingering to account for his carpal tunnel syndrome and release surgery given in the above residual functional capacity, but the record simply does not support a greater limitation on handling and fingering as explained above. (8F, 13-14; 14F; 17F, 8-10; 24F, 37-38). The study is not consistent with the opinions of the State Agency physicians, Dr. Malak, and Consultative Physical Examiner, Dr. Schefft, but is somewhat consistent with the functional capacity evaluation and the testimony of the claimant.

(Tr. 31). Thus, the ALJ considered Mr. Nelson's complaints, analyzed the relevant medical evidence, considered the arguments of Mr. Nelson's counsel, and ultimately concluded that the evidence supported a limitation of frequent handling and fingering. Despite his arguments to the contrary, Mr. Nelson has not established that the ALJ erred by doing so.

Moreover, Mr. Nelson's argument that the ALJ erred by not considering whether his headaches satisfied the criteria of SSR 19-4p and relatedly, Listing 11.02, lacks merit. The ALJ addressed Mr. Nelson's headaches, including Mr. Nelson's treatment with Tylenol and aspirin with good response, as well as records indicating that Mr. Nelson's headaches were stable and, as of July 2020, Mr. Nelson was "not really having any headaches lately[.]" (Tr. 24-25, 29, 678). While Mr. Nelson relies, in part, on his subjective complaints to support his argument, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Yee v. Comm'r of Soc. Sec.*, No. 1:21-CV-02067, 2023 WL 121417, at *8 (N.D. Ohio Jan. 6, 2023) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003)). Mr. Nelson has not pointed to specific evidence that demonstrates he reasonably could meet the requirements of SSR 19-4p and relatedly, Listing 11.02, nor has he otherwise established that the ALJ's conclusions regarding his headaches lack

the support of substantial evidence.

Next, Mr. Nelson's argument that the ALJ erred by determining that his pain and subjective complaints were not entirely consistent with the medical evidence lacks merit. While Mr. Nelson points to medical records documenting his complaints of pain, he has not explained how the ALJ's decision in this regard lacks the support of substantial evidence. As outlined above, the ALJ summarized the relevant medical records and cited the portions of the record upon which he relied. Mr. Nelson has not challenged these records, nor has he challenged the ALJ's reliance upon them. Even assuming without deciding that substantial evidence exists to support Mr. Nelson's argument in this regard, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Patterson v. Colvin*, No. 1:14-CV-01132, 2015 WL 4644603, at *11 (N.D. Ohio Aug. 4, 2015).

Moreover, Mr. Nelson's arguments that the ALJ erred at Step Three by providing a perfunctory analysis, that the ALJ erred by failing to consider the combined effect of his physical impairments, and that the ALJ essentially "cherry picked" evidence to support his findings lack merit. As explained above, viewing the ALJ's decision as a whole, the ALJ's Step Three analysis is not "perfunctory" as Mr. Nelson suggests. *See Anderson*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) (citing *Immke*, 2020 WL 1940849, at *6 (N.D. Ohio April 22, 2020)) ("It is well-established that a reviewing court conducts a holistic review of the ALJ's decision and may look to findings elsewhere in the opinion to support Step Three conclusions."). Additionally, an ALJ's "analysis of a claimant's combined impairments is sufficient where the judge referred to a 'combination of impairments' in deciding the claimant did not meet the listings and all of the claimant's impairments were discussed individually in the decision." *Austin v. Comm'r of Soc. Sec.*, 714 F. Appx. 569, 575 (6th Cir. 2018) (citing *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987)); *Wilson v. Kijakazi*, No. 5:20-

CV-02414, 2022 WL 4616979, at *5-6 (N.D. Ohio Sept. 30, 2022) (citations omitted). That is what occurred here. (Tr. 19, 22, 32).

Further, as noted by the Sixth Circuit, the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir.2009). As previously noted, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted). Here, despite Mr. Nelson's arguments to the contrary, the ALJ built an accurate and logical bridge to support his decision, and Mr. Nelson has not established that he is entitled to the remand he requests. For all of the foregoing reasons, Mr. Nelson's second assignment of error lacks merit.

### 3.  Mr. Nelson's Third Assignment of Error

Mr. Nelson also argues that the ALJ erred at Step Four by determining that he could still perform his past relevant work. (ECF Doc. No. 8, PageID # 861-863).

#### i.      Step Four

As previously noted, at Step Four of the sequential analysis, the claimant has the burden to establish that he is unable to perform his past relevant work in light of his RFC. 20 C.F.R. § 404.1520(a)(4)(iv).

#### ii.      The ALJ's Analysis

At Step Four, the ALJ concluded that Mr. Nelson is "capable of performing past relevant work as a Sales Clerk, Food, and Telephone Solicitor." (Tr. 32). The ALJ explained, in part, that "[t]his work does not require the performance of work-related activities precluded by [Mr. Nelson's] residual functional capacity[.]" (*Id.*).

### iii.      Mr. Nelson's Arguments

Mr. Nelson argues that, even though the ALJ stated that he considered all of the limitations related to Mr. Nelson's impairments, the ALJ erred by failing "to include the frequent need for a bathroom related to chronic diarrhea as noted in the medical records and testimony." (ECF Doc. No. 8, PageID # 862). Mr. Nelson then points to his hearing testimony wherein he testified that he uses the bathroom three to four times per day for fifteen minutes, that he has gas and pain, and that – on a bad day – he uses the bathroom five or six times. (*Id.*). Mr. Nelson also points to the VE's testimony indicating that the frequent need for a bathroom would be vocationally relevant to Mr. Nelson's ability to engage in gainful activity on a full-time and sustained basis. (*Id.* at PageID # 863). Mr. Nelson concludes that the matter "should be remanded for consideration of the acknowledged limitations and the fact that they should result in a finding that [Mr.] Nelson could neither perform his past relevant work nor any substantial gainful activity on a full-time and sustained basis." (*Id.*).

### iv.      Analysis

Mr. Nelson is correct in that the RFC does not include a limitation regarding Mr. Nelson's alleged need for frequent access to a bathroom related to his chronic diarrhea. While Mr. Nelson cites his own statements and testimony in support of his position, his argument ignores the medical records upon which the ALJ relied when addressing Mr. Nelson's chronic diarrhea and diverticulitis. For example, the ALJ cited medical records indicating that Mr. Nelson's symptoms improved with medication, that his symptoms worsened when he consumed lactose and stopped taking fiber, that he presented with a soft, non-tender abdomen, that he exhibited normal bowel sounds, that he denied diarrhea at times, and that he received conservative treatment. (Tr. 21). The ALJ indicated that he considered Mr. Nelson's chronic diarrhea and diverticulitis when considering Mr. Nelson's RFC (Tr. 21), and ultimately determined that Mr. Nelson's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely

consistent with the medical evidence (Tr. 23).

Mr. Nelson has not demonstrated that additional limitations beyond those contained in the RFC were required, or that the ALJ's Step Four decision is not supported by substantial evidence. *See Stuber v. Comm'r of Soc. Sec.*, No. 1:17 CV 1501, 2018 WL 4283047, at *6-7 (N.D. Ohio Sept. 7, 2018) (holding, in part, that the ALJ did not err by failing to include limitations regarding bathroom breaks in the RFC assessment when the medical records did not support the claimant's subjective complaints). In other words, Mr. Nelson has not met his burden of establishing that the ALJ erred at Step Four by not determining that Mr. Nelson was precluded from performing his past relevant work in light of his chronic diarrhea/alleged frequent need for a bathroom. Accordingly, Mr. Nelson's third assignment of error lacks merit.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the ALJ's decision.


Dated: January 31, 2023                                    *s/Jennifer Dowdell Armstrong*
                                                            Jennifer Dowdell Armstrong
                                                            U.S. Magistrate Judge




## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District

Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Id. (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. Berkshire v. Dahl, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. Howard v. Sec'y of Health and Hum. Servs., 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" Overholt v. Green, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting Howard). The failure to assert specific objections may in rare cases be excused in the interest of justice. See United States v. Wandahsega, 924 F.3d 868, 878-79 (6th Cir. 2019).